Filed 3/28/13  P. v. Watson CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B232509 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA110608) |
| v. | |
| ARLON WATSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

A jury found defendant and appellant Arlon Watson guilty of the first degree murder of Dannie Farber and found true gun and gang allegations. On appeal, defendant contends that the judgment must be reversed because of juror misconduct, discovery violations, and the introduction of inadmissible hearsay and character evidence. We hold that reversible error did not occur and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Factual background.**

A.     *Prosecution's case.*

In May 2009, Farber was a high school senior with above-average grades who also played football. He planned either to attend college and play football or to become a firefighter. Becoming a firefighter would, Farber hoped, give him the resources to move his family out of the Compton area. He was not a gang member, and he had no arrest record.

On May 24, 2009, around 9:30 p.m., Farber was at a Louisiana Fried Chicken on Rosecrans and Central with his girlfriend, Araceli Nogueda. A man came into the restaurant and walked to Farber's and Nogueda's table. He asked Farber, " 'Where you from, cuz?' " Standing, Farber responded, " 'What?' " Pulling a gun from his left pocket, the man shot Farber multiple times. Farber died at the scene, having sustained three gunshot wounds.

Delmer Perry and his 13-year-old son were in the restaurant. After ordering, Perry told his son to wait for the food while he went to the nearby Food 4 Less. When he walked out, Perry saw a Black man and woman in a light colored Nissan Maxima or Toyota Camry waiting for an order. An 18-or 19-year old slender Black man just under six feet tall wearing a black hooded sweater and a bandanna or beanie walked by Perry into the restaurant. Although shown two photographic six-packs containing defendant's

photograph, Perry could not identify him as the person he saw that night.[1]  Perry could not identify defendant at trial.

Randy Wells and Anika Cooks were in a Toyota Camry in the restaurant's drive-thru.  While waiting for their food, defendant, wearing a black hoodie and black baseball hat, walked in front of their car.  Wells and defendant were good friends and neighbors.  Knowing that defendant was a Tragniew Park Crip, Wells asked if he needed a ride, because they were in a Blood area.  Shaking his head, defendant walked into the restaurant.  Wells noticed a semiautomatic gun stuck in defendant's belt.  Because the restaurant door was open, Wells heard defendant ask Farber where he was from.  Farber stood, balled up his fist and answered, " 'Neighborhood Piru.' "

Defendant shot Farber.  Defendant ran and got into the passenger side of a car that Wells recognized as belonging to Brandon Washington, who hung around defendant and other Tragniews.  When the police arrived, Wells, not wanting to get involved, told them he didn't see anything.

Nogueda, however, told police the shooter weighed 160 to 170 pounds, was 5 feet 8 or 9 inches tall,[2] and was 19 or 20 years old.  At trial, Nogueda said the shooter was taller than she and Farber, and she was 5 feet 4 inches and Farber was an inch or two taller.  Although shown two photographic six-packs containing defendant's photograph, Nogueda could not identify him.  But she identified him as the shooter at the preliminary hearing and at trial.

The day after Farber was shot, defendant went to Wells's house.  Wells could see Washington waiting in his car.  Defendant asked Wells if he was going to say anything about " 'last night,' " and Wells told him not to worry—he wouldn't say anything.

He didn't, until April 2010, when Detective Eddie Brown, the investigating officer from the Los Angeles County Sheriff's Department, told Wells's mother that if Wells

---

[1]     From one six-pack, Perry selected a man who "maybe could be" the shooter, but he was not certain, because " '[a]ll I really seen was his eyes.' "

[2]     Defendant is 5 feet 11 inches tall, and he weighs 178 pounds.

didn't call the detective, he would put out a warrant for him.  When speaking to the detective, Wells at first maintained he didn't know anything about the shooting, but when the detective indicated he knew more than Wells suspected, Wells said he would think about talking to him.  After thinking about it, Wells told the detective what he knew about the shooting; namely, he saw defendant shoot Farber.

Ashley Webb knew defendant and other Tragniew Park Crips.  Sometime around Memorial Day in 2009, just weeks after Farber was murdered, Webb was with a group of people that included defendant.  Defendant admitted he killed Farber, whom defendant referred to as a "slob,"[3] after exchanging words with him.  Defendant said he was with Washington getting something to eat when it just happened.  It was only in January 2010, at Washington's urging, that Webb told Detective Brown what defendant said.

On January 28, 2010, Detective Brown saw defendant with Damon Pearson.  When the detective identified himself and ordered the two men to get on the ground, Pearson obeyed, but defendant said he did not have a gun and ran.  He was soon detained.  Defendant denied being at Louisiana Fried Chicken the night Farber was killed.  Jeans with a design on them were recovered from defendant's home, and they might match jeans the shooter wore, as shown in video surveillance from Louisiana Fried Chicken.

In recorded jailhouse telephone conversations, defendant said he could "beat all the fingerprints on the door and the fingerprint on the chair, 'cause I eat at Louisiana . . . .' "  He was "ready to do whatever right now, but just . . . see daylight again."

Detective Eric Arias from the Los Angeles County Sheriff's Department testified as the People's gang expert.  Tragniew Park is a Crips gang located in the southwest area of Compton and having about 80 documented members.  Like most Crip gangs, they feud with Blood gangs, including Piru.  Tragniew's primary activities are vandalism, graffiti, possessing narcotics for sale, possessing guns including assault rifles, burglary, robbery, attempted murder, assault with a deadly weapon, witness intimidation, and murder.

---

**3**     This is a disrespectful way to refer to a Blood gang member.

4

In Detective Arias's opinion, defendant was a Tragniew Park Crip known as "AWACC." The moniker might end in " 'CC' " rather than " 'CK' " because " 'CK' " stands for " 'Crip Killer.' " Defendant had " 'CPT' " tattooed behind his left ear and two teardrops near his right eye. The detective saw defendant in the company of other Tragniew Park Crips in June 2009, and there were field interview cards on him from 2005 to the end of 2009 indicating that defendant admitted to being a Tragniew Park Crip. Washington (defendant's companion on the night Farber was shot), if not a full-fledged member of the Tragniew Park Crips, was an associate of the gang.

In Detective Arias's opinion, if an admitted Tragniew Park Crip was driven to a Louisiana Fried Chicken by a Tragniew associate, and the Crip went into the restaurant and confronted Farber with, " 'Where [are] you from?' " and shot him, the crime was committed for the benefit of and in association with the Tragniew Park Crips. Murdering a rival gang member is the ultimate crime for a gang member to commit. Such crimes create fear in the community and elevate the gang's reputation.

B. *Defense case.*

**1. Gang expert.**

Martin Flores, a gang expert, testified that there is no evidence defendant is a Tragniew Park Crip. Defendant denied he was a gang member. Defendant's " 'CPT' " tattoo stands for " 'Compton,' " not Tragniew Park Crip, and " 'Compton' " by itself does not signify a gang affiliation. Teardrop tattoos, such as the ones defendant has, might refer to many things, including to a person who died and to murder. Flores did not come across evidence that defendant's teardrop tattoos refer to murder, and defendant does not have any tattoos commonly associated with Tragniew Park Crips. Flores also found no evidence to associate defendant's moniker, AWACC, with a gang.

Field identification cards are created to keep records on individuals and to document gang members and their activities, but they are also used as a scare tactic to get information from people. Three of defendant's field identification cards were created after Farber was shot and defendant would have run or left rather than answer questions during those stops. Flores saw no photographs of defendant posing with weapons,

5

throwing gang signs or wearing gang clothing. Flores also saw no graffiti with defendant's name or moniker. Defendant lived in an area claimed by a Blood gang, and if he was a Crip, Flores would have expected him to have been shot at, stabbed or jumped. That he hadn't been harmed indicates he was not a gang member, had disassociated from the gang or had minimized his role in the gang. Although "cuz" can refer to Crips, young people who are not gang members also use it.

Based on the "ruthlessness" of the crime at issue, Flores's opinion was that the shooter was an individual "heavily involved" in the gang with a history of prior violent crimes.

### 2.     Eyewitness identification expert.

According to Dr. Robert Shomer, an eyewitness identification expert, eyewitness identification is the least reliable means of identification. Under the best of circumstances—good lighting, small distance, ample duration, and lack of stress— eyewitness identification has a low reliability rate of about 50-50. Stress creates a poor condition for accuracy, as does cross-racial identification and the presence of a weapon. Accuracy decays after the first 24 hours.

An initial description is critical because it gives an "index" of what the person was able to see and it "gives you some idea of the match between the person described and the person later identified." People who are threatening tend to be described as larger than they are. Also, people become, over time, more convinced of the accuracy of their identification, even though memory declines with time.

A person who cannot identify a shooter from a six-pack but is later able to make an in-court identification has not made a reliable identification. It is highly suggestive to ask a person to identify a suspect in court after viewing the suspect in a six-pack.

### 3.     The eyewitness.

On the night Farber was shot, Debra Lindsey was in the parking lot at the Food 4 Less near Louisiana Fried Chicken. She saw a Black man wearing a dark hoodie running. She told a detective that the man was approximately 5 feet 6 inches to 5 feet 8 inches tall. On June 12, 2009, Lindsey reviewed a photographic six-pack and circled

6

the picture of the person she saw running that night. She was 85 to 90 percent certain of her identification. On December 3, 2009, Lindsey was shown a second six-pack containing a photograph of defendant. She could not identify anyone from that six-pack.

## II. Procedural background.

Trial was by jury. After seven days of testimony, the jury began deliberations on February 4, 2011. The jury initially deadlocked after deliberating almost two days, which included readback of testimony.[4] After being instructed to deliberate further, the jury indicated it had reached a verdict, but could not agree on the gang allegation or the degree of murder. After a juror stated that further instructions or clarification of instructions would assist deliberations, the trial court directed the jurors to deliberate further. On February 14, 2011, the jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a))[5] and found true gun-use (§ 12022.53, subds. (c), (d)) and gang (§ 186.22, subd. (b)(1)(C)) allegations.

On February 16, 2011, the trial court sentenced defendant to a total of 80 years to life as follows: 25 years to life for Farber's murder doubled to 50 years under the Three Strikes law,[6] plus 25 years to life for the gun-use enhancement, plus 5 years for the prior conviction (§ 667, subd. (a)(1)).

## DISCUSSION

## I. Juror bias.

A sitting juror revealed that he knew defendant. After conducting an inquiry, the trial court denied the defense's request to dismiss the juror. Defendant now contends that the court's failure to remove the juror violated his due process and jury trial rights under the Sixth and Fourteenth Amendments.

---

[4] The jury said it had taken four votes: the first was 8-4, the second was 6-6, the third was 8-4, and the fourth was 8-4.

[5] All further undesignated statutory references are to the Penal Code.

[6] After a court trial on a prior allegation, the trial court found that defendant sustained a prior robbery conviction.

7

A. *Additional facts regarding Juror No. 12's statements about defendant.*

Juror No. 12 informed the court that after moving his seat, the juror got a better look at defendant and recognized him. The juror saw him a "long time ago" by "Corlett Avenue" where the juror had lived for 22 years. The juror explained that there was a house "almost in front of my house. So many people stay there. But I don't see him stay there, so just pass a couple of times. But a long time ago, you know." The juror would see defendant walking by, and he added that "they sell a drug in both place[s], Corlett and next to the Rosecrans" and the police would go there.

When asked if he saw defendant doing anything other than walking by, the juror answered, "What can I say? So I just saw it. I don't know. I'm not sure if he is buying the drug or—or make deliver[y]. You know, I don't know. I don't know. But he just walking."

The prosecutor asked if this would prevent the juror from reaching a decision, and he said, "Yes," because of his family. "The thing is—more important thing is I'm afraid to shooting to me or shooting to my family or my home. Because two months, in November, I think, they—they tried to kill to somebody in those—in that— exactly almost in front of my house, you know. The other house. So they shooting in my friend['s] house." Because the juror expressed concern for his safety, the court asked if that would prevent him from voting guilty or not guilty. Juror No. 12 answered, "Not really in myself. Okay? If you do something wrong—like my father tell me, if you do something wrong, you [have] to pay. That's it, you know." He could still sit on the jury, "[b]ut I just let you know if something happen later. You know what I mean?" "Because some people is too—that kind of people is too danger for me."

The juror denied he had a good or a bad impression of defendant; he was "neutral." He confirmed that he merely saw defendant walking; he did not see defendant visiting one of the drug houses, and the juror did not associate defendant with a gang. Defense counsel then asked if he could be fair or "if you're just going to assume that he's a gang member or that he did this crime because he's, you know, walking near some people's houses that you say are gang members? [¶] . . . [¶] . . . Is that a problem?

8

"Juror No. 12: That's a problem for me.

"[Defense counsel]: That's a problem for you?

"Juror No. 12: Yes. Yes.

"[Defense counsel]: . . . So that's going to be a problem for Mr. Watson then, if that's a problem for you. Right?

"Juror No. 12: I think so.

"[Defense counsel]: Okay. So then you can't be fair. I mean it wouldn't be fair to Mr. Watson if you're going to associate him with a gang member or bad activities.

"Juror No. 12: Because right now the procedure is going. I see—I see he had maybe 30 or 40 percent he's doing bad thing."

The trial court asked Juror No. 12 if he could base his decision only on the evidence in court. The juror said he could, but he was afraid that if, for example, defendant was found guilty, people "from that area" "[m]aybe they know me." When the court replied that he would have to put that aside and base the case on the evidence, the juror said he could.

Following up on that point, defense counsel asked if, based on this fear, the juror was more likely to find defendant guilty or not guilty. The juror answered, "That's my point. It's if finding guilty because it's not good for . . . my safety[.]" The court then asked if fear for his safety would make the juror more hesitant to vote guilty. The juror answered, "No," and he couldn't tell the court if he would come back with a "yes" or "no" because "we have to talk with my group." He could "[m]aybe, yes" come back with a guilty verdict even though he was afraid. Saying that the juror's use of "maybe" was a cause for concern, the trial court again asked whether, regardless of his fear, the juror could find defendant guilty. The juror said, "Yeah, guilty," but if the People did not prove the case, he could vote "[n]ot guilty." The juror also said he knew he would not use as evidence any belief that defendant was involved with gangs.

Defense counsel "challenge[d] . . . for cause" the juror. The trial court found, "ultimately, he's actually very articulate and ultimately he expressed what his concerns

9

were, and he said—constantly he said, " 'I don't know. I have to see the evidence. I don't know.' And I don't think it rises to the challenge for cause at this point."

      B.    *The trial court did not abuse its discretion by refusing to dismiss the juror*.

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [Citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) "If a juror has any personal knowledge respecting a fact in controversy in a cause, he or she must declare the same in open court during the trial. If, during the retirement of the jury, a juror declares a fact [which] could be evidence in the cause, as of his or her own knowledge, the jury must return into court. In either of these cases, the juror making the statement must be sworn as a witness and examined in the presence of the parties in order that the court may determine whether good cause exists for his or her discharge as a juror." (§ 1120; see also *People v. Cleveland* (2001) 25 Cal.4th 466, 476.) "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged . . . ." (§ 1089; see also *People v. Farnam* (2002) 28 Cal.4th 107, 140-141.)

The standard of review applicable to removing a sitting juror requires the juror's disqualification to appear on the record as a " ' "demonstrable reality." ' "[7] (*People v. Farnam, supra,* 28 Cal.4th at p. 141; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052; *People v. Fuiava* (2012) 53 Cal.4th 622, 711.) "This standard 'indicates that a stronger evidentiary showing than mere substantial evidence is required to support a trial court's decision to discharge a sitting juror.' [Citation.]" (*Barnwell,* at p. 1052.) The demonstrable reality test is "more comprehensive and less deferential" than the

---

[7]    To support his assertion a de novo standard of review applies, defendant erroneously cites, among others, *Jane Doe 8015 v. Superior Court* (2007) 148 Cal.App.4th 489, which applied a de novo standard of review to a decision denying a peremptory challenge to a trial judge under Code of Civil Procedure section 170.6.

substantial evidence standard. (*Ibid.*) "It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established. . . . [A] reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Id.* at pp. 1052-1053; see also *Fuiava,* at p. 712.) The reviewing court must therefore consider the evidence and the record of reasons the trial court provided. (*Barnwell,* at p. 1053.)

Receiving information about a party or the case that is not part of the evidence received at trial is a ground for discharge from a jury. (*People v. Cowan* (2010) 50 Cal.4th 401, 507.) But, considering the evidence and the reasons the trial court here provided for refusing to discharge Juror No. 12, the juror's alleged bias is not a " ' "demonstrable reality." ' " Contrary to defendant's assertions that the juror was "actually biased" because he said he saw defendant associating with gang members, saw defendant at or near a gang/drug house, and suspected defendant was buying or delivering drugs to that house, the juror made no such express assertions. What Juror No. 12 clearly and expressly said was he saw defendant walking or passing by.

Certainly, the juror said there were one or two houses on his street from which drugs were sold, but he never said he saw defendant going into those houses. In fact, the juror said he did *not* see defendant "stay there, so just pass a couple of times" a "long time ago." He did not see defendant buy or deliver drugs to the houses: "I'm not sure if he is buying the drug or—[to] make deliver[y]. You know, I don't know. I don't know. But he just walking." The juror also did not say he thought defendant was a gang member: he said "no," he did not associate defendant with being a gang member because he saw defendant near the houses. "I just say I know him, saw a long time ago . . . ." At most, the juror saw defendant passing by the juror's house and/or the drug houses and made a connection in his mind between defendant and those houses, but he did not see defendant go into the houses. As to any connection the juror made between the defendant and the drug houses, the juror said he could remain neutral.

11

Although the juror made equivocal and conflicting statements about whether he could be fair based on safety concerns, he ultimately agreed he could vote either guilty or not guilty, depending on the evidence presented at trial. Where, as here, the evidence bearing on whether a juror exhibited a disqualifying bias is in conflict, the trial court must weigh the credibility of those whose testimony it receives, taking into account the nuances attendant upon live testimony and on its observations of jurors during voir dire and trial. (*People v. Barnwell, supra,* 41 Cal.4th at p. 1053.) "Naturally, in such circumstances, we afford deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal." (*Ibid.*) The trial court here, after examining the juror at length and observing him, made an express finding that the juror would evaluate the evidence at trial as required by law. No abuse of discretion occurred in keeping Juror No. 12 on the jury.

C.  *The juror's alleged lack of English proficiency was not a ground to dismiss him.*

For the first time on appeal, defendant raises an additional reason why Juror No. 12 should have been excused: his English was inadequate. Defendant raised no challenge to the juror on this ground, and therefore the issue on appeal is forfeited. (See *People v. Souza* (2012) 54 Cal.4th 90, 129; *People v. Kipp* (1998) 18 Cal.4th 349, 365.)

Even if it was not forfeited, it is meritless. Insufficient command of English to allow a full understanding of the instructions and participation in deliberations renders a juror unable to perform his or her duty within the meaning of section 1089. (*People v. Elam* (2001) 91 Cal.App.4th 298, 316.) That inability to comprehend, however, must appear as a demonstrable reality in the record. (*Ibid.*) Some language difficulty is insufficient. (*Ibid.*)

Juror No. 12's inability to comprehend the proceedings does not appear as a demonstrable reality in the record. The juror was from El Salvador, and his first language was Spanish. Despite some difficulties with English, the trial court nonetheless found him to be "very articulate." The record supports that finding. Although the juror's spoken English was somewhat broken, he clearly understood the questions asked of him

12

and he responded appropriately to them.  (Cf. *People v. Szymanski* (2003) 109 Cal.App.4th 1126, 1131-1132 [demonstrable reality existed to support discharge of juror whose responses were in broken English, who said she did not speak English on a daily basis, and who could not " 'catch' " " '[s]ome of the words' " because she was from China].)  Moreover, we will not second guess a trial court's credibility judgment where it depends, in part, on observing the witness.  (*People v. Barnwell, supra,* 41 Cal.4th at p. 1053.)  Where, as here, such firsthand observation might be key to a credibility determination *and* to understanding the witness, we afford deference to the trial court.

## II.     Discovery violations.

The trial court denied discovery concerning Washington, defendant's friend who drove him from crime scene.  Defendant now contends that this violated his constitutional rights to a fair trial, to confrontation, and to due process under the Sixth and Fourteenth Amendments of the United States Constitution.  We disagree.

### A.     *Additional facts regarding discovery.*

Before trial, the trial court and the parties discussed discovery of a home-invasion robbery involving Washington, who drove defendant from the scene of Farber's murder. The defense wanted to discover whether Washington received consideration in the home-invasion case for making a statement against defendant in the murder case.  The prosecutor informed the court that the "residential burglary packet reports and supplementals" had already been turned over to the defense, because one of the participants in that burglary, Ashley Webb, would testify at defendant's murder trial. Defense counsel argued that he should get additional information, for example, MDT's, CD's, and 911 calls.

The prosecutor argued that any other discovery concerning the home-invasion case was irrelevant because it was rejected for filing *before* defendant was named as a suspect in Farber's murder.  The prosecutor offered to give the trial court the district attorney's

13

reject for review.[8]  After reviewing the reject, the trial court said that the rejection had "nothing to do with that person, . . . or anything to do with anything other than the facts of the case."  The reject had "nothing to do with deals, the dates don't match any of that." The trial court therefore found that the defense was not entitled to additional information because it was not relevant, as shown by the date of the reject and the date defendant was named as a suspect.

Defense counsel thereafter renewed his discovery request via a motion for continuance.  Defense counsel argued that Washington was involved in a separate home-invasion robbery, and in exchange for making statements against defendant, the district attorney elected not to file the home-invasion case and gave him money to relocate.  The defense therefore wanted discovery regarding Washington and that home-invasion case, although defense counsel conceded he had already received "three summaries of what was said in the supplemental reports."  The prosecutor repeated that the relevant timeline mitigated against such discovery about Washington, who would not be called as a prosecution witness:

- Farber was murdered on May 24, 2009.
- On October 23, 2009, the home-invasion robbery in which Washington was involved occurred.
- On October 27, 2009, the district attorney rejected the home-invasion case for filing.
- Three days later, on October 30, 2009, defendant's brother, Arlis Watson, was arrested and implicated defendant in Farber's murder and named Webb and Washington as witnesses.

In response to defense counsel's argument he wanted to establish that the merits of the home-invasion case were such that it should not have been rejected, the trial court said that was an improper purpose.  Defense counsel could not get the discovery so he

---

[8]     The prosecutor refused to allow the defense to see documents concerning the reject because it was "work product."  Apparently, however, the rejection was based on the victim's refusal to testify.

could form an opinion that the district attorney had a strong case against Webb and Washington. Such a strategy would lead to an improper mini trial on the home-invasion robbery. The discovery's only relevance would be to impeach the witnesses, including Detective Brown, via cross-examination with any leniency they received. The trial court ruled that the discovery was not relevant and would confuse the jurors.

When defense counsel again renewed his discovery request,[9] the prosecutor said he would not call Washington as a witness. When the trial court noted that the discovery was then irrelevant, defense counsel agreed, "Well, obviously if he's not going to be used as a witness, it wouldn't have any relevance."

Washington, in fact, did not testify at trial. Detective Brown, however, who interviewed Washington, testified, over defendant's objection, about statements Washington made to him implicating defendant in Farber's murder.[10]

B.      *The trial court did violate defendant's constitutional or statutory rights by denying the discovery.*

"The obligation of the People to disclose information to the defense is dependent upon whether that obligation has a constitutional or statutory basis. As articulated by the United States Supreme Court in *Brady v. Maryland* (1963) 373 U.S. 83, the prosecution has a sua sponte obligation, pursuant to the due process clause of the United States Constitution, to disclose to the defense information within its custody or control which is material to, and exculpatory of, the defendant. [Citations.] This constitutional duty is independent of, and to be differentiated from, the statutory duty of the prosecution to disclose information to the defense." (*People v. Bohannon* (2000) 82 Cal.App.4th 798,

---

[9]      The trial court summarized defense counsel's position: "[A] fellow named Washington who was the alleged driver of the car that left the scene of the shooting with Mr. Watson alleged to have been the shooter. That he was later arrested on a burglary and that he must have given information on the incident to the police in exchange . . . for promises of leniency of a $10,000 reward. And I don't know how many other things. And what [defense counsel's] motion, motion for a continuance seeks, is every piece of paper, every known thing that you can find in Mr. Washington's file."

[10]      We address the admissibility of those statements *post*.

804, disapproved on another ground by *People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13; see also *People v. Gutierrez* (2003) 112 Cal.App.4th 1463, 1471-1472.) Due process may be violated when the evidence withheld is material either to guilt or to punishment. (*People v. Gaines* (2009) 46 Cal.4th 172, 183.) Evidence is material if there is a reasonable probability that had it been disclosed to the defense, the result of the proceeding would have been different. (*Ibid.*)

Section 1054 et seq. set forth the procedure for discovery in criminal cases in California. Under this statutory scheme, the prosecutor must disclose, among other things, the names and addresses of persons the prosecutor intends to call as witnesses at trial, all relevant real evidence of the charged offenses, the existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial, any exculpatory evidence, and relevant written or recorded statements of witnesses whom the prosecutor intends to call at trial or reports of such statements. (§ 1054.1, subds. (a), (c), (d), (e) & (f).) We review a trial court's discovery order for an abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

The material the defense sought here about Washington and home invasion was not, based on this record, discoverable under either *Brady* or our state discovery statutes. The material sought was simply irrelevant. The home-invasion case involving Washington had already been rejected for filing by the district attorney *before* defendant was identified as a suspect in Farber's murder. In other words, defendant wasn't named as the shooter in the Farber's case until the district attorney had already decided not to proceed on the case against Washington. In fact, the trial court reviewed the reject of the home-invasion case and represented to defense counsel it had nothing to do with this case. We should and do credit the court's representation about the reject. The rejection therefore could not have been given in consideration for Washington implicating defendant in the crime.

Nor was the defense entitled to discovery concerning Washington and the unrelated home-invasion robbery under section 1054.1, which requires discovery of witnesses the prosecutor intends to call at trial. The prosecutor represented that

16

Washington would not testify. Based on that representation, defense counsel agreed that the discovery was not relevant. And, in fact, Washington did not testify. (*People v. Tillis* (1998) 18 Cal.4th 284, 294 [the scope of discovery in section 1054 et seq. may not be broadened other than by statutory provisions and the federal Constitution].)

Defendant, however, contends that discovery into the home-invasion case was relevant because Washington's statements were ultimately admitted even though Washington did not testify.[11] We fail to see, however, how that discovery would have helped the defense. We repeat: the home-invasion case against Washington was rejected for filing before defendant was named as a suspect. Therefore, the rejection was not given in consideration for Washington's incriminating statements. Moreover, defense counsel was able to explore the notion that the home-invasion case might have been rejected in exchange for Webb's testimony. Webb participated in the home-invasion burglary with Washington. She testified at trial that she was never promised that the home-invasion case would be rejected in exchange for testifying against defendant. The defense cross-examined her on this, and therefore was able to raise an issue as to her credibility.

We therefore conclude that no discovery violation occurred.

### III. Hearsay and the Confrontation Clause.

Washington did not testify, but the trial court allowed Detective Brown to testify about statements Washington made implicating defendant in Farber's murder. Defendant contends that these statements were inadmissible hearsay and that their admission violated his due process rights and Sixth Amendment right of confrontation (see, e.g., *Crawford v. Washington* (2004) 541 U.S. 36). We find that the error in admitting the statements does not require reversal of the judgment.

---

[11] We address the admission of Washington's statements in Section III.

17

A.    *Additional facts*.

Washington, who drove defendant from the Louisiana Fried Chicken and who was involved in the unrelated home-invasion robbery, gave a statement to the police identifying defendant as Farber's killer. Washington did not testify at trial. Detective Brown, however, testified about Washington's statements.

On direct examination in the People's case-in-chief, the prosecutor did not ask Detective Brown about statements Washington gave during the investigation.

On cross-examination, after going over Randy Wells's testimony and his penchant for lying, the defense asked Detective Brown to admit he didn't know when Wells was lying or telling the truth. When the detective said that wasn't correct, counsel asked how he knew when Wells was lying or telling the truth. The detective answered, "Based on the totality of the circumstances that I know, the investigation corroborates the information that he gave me."

Defense counsel then asked whether search warrants had been authored in the case for Washington:

"Q    Brandon Washington was a suspect, though, at some point in the shooting [for] his involvement in the shooting of Dannie Farber?

"A    Yes.

"Q    When was the date that you first began looking at Brandon Washington as a suspect?

"A    I believe it was October 30th.

"Q    Of 2009?

"A    Correct.

"Q    And he was interrogated on November 25th of 2009?

"A    Yes.

"Q    When he was—when Mr. Watson was arrested, you testified the other day that you placed Brandon Washington in a room to try to get incriminating statements out of Arlon Watson; correct?

"A    Yes.

18

"Q     And when you spoke with Mr. Watson, as you testified on Friday, he immediately stated that he had nothing to do with the shooting of Dannie Farber; correct?

"A     Correct.  He denied it, yes."

Defense counsel later asked Detective Brown if he concluded that Washington drove the car involved in Farber's shooting and whether Washington, as the car's driver, would be "looking at life in prison" in this case.  Counsel also asked if it was "fair to say" Washington tried to save himself from prosecution.

On redirect, the prosecutor asked whether Washington was ever a suspect, and the detective answered, "No."  The prosecutor then asked the detective if, in speaking to Washington, "was there anything that you heard that in any way re-focused your investigation on anybody but [defendant]?"  When defense counsel objected as "vague," the trial court asked the prosecutor to be more specific.  The prosecutor therefore asked the detective what Washington told him, and, over defense counsel's hearsay objection, he said, "Brandon told me that Arlon asked him for a ride when they were in Tragniew Park.  There was a female with Arlon.  He was taking him home when they passed Louisiana Chicken.  Arlon, who was seated in the back seat, made a comment about recognizing someone at the Louisiana but he didn't say whether he was an enemy or friend.  [¶]  Arlon told him that he wanted something to eat but he didn't know if he wanted Louisiana or Subway and directed him to park in front of Subway.  [¶]  Brandon parked in front of Subway and backed into a spot.  Arlon exited the vehicle, walked toward the Subway but continued past that out of Brandon's view.  [¶] . . . [¶]  [] A few moments later, Arlon returned to his vehicle, frantic, with a gun in his hand, and told him he just shot somebody, to take off, take him home."  Washington denied knowing that defendant was armed and would shoot somebody.  Defense counsel repeated his "continuing hearsay objection."

The day after Detective Brown testified, defense counsel objected again to the testimony as hearsay and under the Sixth Amendment and moved for a mistrial.  Defense counsel found the testimony especially "problematic" because he had been denied

19

discovery regarding Washington that would have allowed him to use Washington's acts of moral turpitude in cross-examination.

After noting that it was defense counsel who injected Washington into the case during cross-examination,[12] the trial court said: "And then one of the questions you asked, you said, 'Well, how do you know when Randy [Wells] is telling the truth?' And the detective responded, 'Because of the totality of all the witnesses, what they had indicated to me.' " "And I'm assuming, at least now, in hindsight, . . . his statement about identifying who that person was that walked into Louisiana Chicken substantiated Mr. Wells's story that led into the officer's conclusion that he was telling the truth, that you brought up.

"So that information would have been relevant to substantiate why the officer gave the opinion that he was telling the truth. But that was something that you brought up on your cross.

"And then you brought up, and then you didn't leave it alone—you actually said, 'Okay. Now, I want to talk about Brandon Washington.' And you said, '. . . He is a suspect,' and you brought up about he was first interviewed on the 30th of October and then something about another interview on the 5th of November.

"Then you placed Brandon in there, and then you brought in, 'Then my client denied everything during the interview' and then—Ashley Webb—the first initial information was Ashley Webb was in the car.

"And then you brought out something—and I even made note of it because you said, 'During Washington's interview'—you started talking about the interview, and you started talking about that he was just trying to save himself from prosecution.

---

[12] In fact, Ashley Webb first stated that she overheard defendant say that Washington was driving the car the night Farber was murdered. "[Washington] was supposed to be taking him home. They wanted to get something to eat, so they stopped, and that's when everything happened, and he left." Washington just drove the car. Defendant's hearsay objection and motion to strike were denied.

20

"So you were the one who started talking about the interview and the substance of the interview.  [¶] . . . [¶]

"Then so you essentially—[and] I hate to use the term 'opened the door,' but your questions were the ones that led the direction of, well, you brought in the substance and in summary with regard to Brandon Washington's statement, [and] you were the one that did that.  [¶] . . . [¶]

"Then the D.A. asked a question, and he asked it in a sense that, 'Anything that Mr. Washington said didn't lead you away from Mr. Watson' . . . . [¶] . . . [¶]

"You objected to that as vague.  [¶] . . . [¶]  Then you said, 'Objection.  Hearsay.' And I overruled it.  You objected to it being too vague.  Counsel tried to limit it, and you objected to the limitations.  [¶] . . .  I think, based on your tactical decision to present this evidence to the jury, that it was proper for the People to be able . . . to challenge your proposition that Brandon Washington was just trying to save himself during this interview."

Defense counsel responded that none of his questions called for hearsay.  The trial court again responded that it was defense counsel who asked "the detective his opinion whether or not he could tell whether Mr. Wells was telling the truth, and he says, 'I think he is telling the truth and based on the totality.' "  The court then reasoned that the detective could then state what led him to the conclusion Wells was telling the truth.

The trial court therefore denied the mistrial motion and instead gave this limiting instruction:  "You [have] heard testimony regarding a statement allegedly made by Brandon Washington.  This alleged statement was not admitted for the truth of the statement and you are instructed not to consider it as such.  The alleged statement was admitted only for the limited purpose as a basis for opinions given by Detective Brown. You must disregard this alleged statement for any other purpose."

B.	*It was error to admit Washington's statements.*

Defendant first argues that Detective Brown should not have been allowed to testify about what Washington told him defendant said because it was inadmissible hearsay.  Hearsay evidence is evidence of a statement made other than by a witness while

21

testifying at the hearing and that is offered to prove the truth of the matter asserted. (Evid. Code, § 1200, subd. (a).) The hearsay evidence here was, in essence, that defendant, on the night Farber was killed, told Washington he had just shot somebody. Washington later repeated defendant's statement to Detective Brown. Washington's out-of-court statement that defendant shot Farber established the truth of the matter asserted, namely, defendant shot Farber.

Unless an exception applied, this hearsay was inadmissible. (Evid. Code, § 1200, subd. (b).) The People contend there was an exception: it was admissible for the " 'nonhearsay purpose' " of establishing Detective Brown's state of mind or opinion about why he believed Wells told the truth. The trial court, by referring to the defense "opening the door" to Washington's statements, apparently agreed with this basis for admitting the hearsay.

Under Evidence Code section 1250,[13] an out-of-court statement to prove the declarant's state of mind is not made inadmissible by the hearsay rule when the declarant's state of mind is in issue or if the evidence is offered to explain the declarant's acts or conduct. (See generally, *People v. Kovacich* (2011) 201 Cal.App.4th 863, 884 [prerequisite to this exception is the declarant's mental state or conduct must be placed in issue]; *People v. Riccardi* (2012) 54 Cal.4th 758, 814, 820 [evidence of a decedent's state of mind can be relevant to a defendant's motive, if there is independent, admissible evidence that the defendant knew of the decedent's state of mind before the crime and may have been motivated by it].) In *Mendoza*, for example, cited by the People, the dead victim's statement that the defendant had sexually molested her was admitted. (*People v. Mendoza* (2007) 42 Cal.4th 686, 695.) The statements were admissible for the limited

---

[13] "[E]vidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).)

22

nonhearsay purpose of showing that the defendant, angered by the accusations, murdered the victim. (*Id.* at pp. 697-698; see also *People v. Scalzi* (1981) 126 Cal.App.3d 901, 907 (*Scalzi*) [where a statement is relevant to explain the hearer's reaction, it is not offered for the truth of the matter asserted in the statement].)

The People thus argue that Washington's statements explained why Detective Brown believed Wells was credible. But whether the detective believed or had the "opinion" that Wells was credible was irrelevant.[14] In *Scalzi*, for example, defendant said he was merely in the wrong place at the wrong time when, minutes after coming to visit a friend, officers entered the location and found him sitting with others around a table on which drugs and drug paraphernalia were in plain view. (*Scalzi, supra,* 126 Cal.App.3d at p. 904.) An officer answered the telephone at the location, and, at trial, over a hearsay objection, repeated what the unidentified caller said, namely, had Scalzi had gotten it "bagged" up. (*Id.* at pp. 905-906.) The officer interpreted "bagged" to refer to drugs.

The People argued that the caller's statements were not offered to prove their truth, that is, that Scalzi was bagging up drugs. Rather, the statements showed why the officer booked him on the particular charges, since Scalzi was not told what he was being arrested for until after the telephone conversations took place. (*Scalzi, supra,* 126 Cal.App.3d at p. 906.) The court rejected this argument because the officer's state of mind why he arrested Scalzi was irrelevant—his state of mind did not tend to prove or disprove any issue in the case. (*Id.* at pp. 906-907.) The officer's "*reaction* or state of mind after the telephone conversation and any actions he took based thereon shed no light on any issues presented in the case." (*Id.* at p. 907.)

Similarly, Detective Brown's state of mind or opinion about Wells's credibility was not at issue in the case. Wells's credibility was at issue but not the detective's opinion about it. Indeed, an officer's opinion about a witness's truthfulness does not

---

**14** We agree with defendant that Detective Brown's testimony was not admissible as an expert opinion under Evidence Code section 801. (See *People v. Sergill* (1982) 138 Cal.App.3d 34, 39.) The trial court, however, did not admit the testimony on that basis; the People agree it was not admitted on that basis; and Detective Brown obviously was not testifying as an expert. We therefore need not address the argument further.

have a reasonable tendency to prove or disprove the witness's credibility, and it is therefore irrelevant. (*People v. Sergill*, *supra*, 138 Cal.App.3d at p. 40.) That Washington's statements corroborated Wells's story, making the detective believe Wells and/or Washington, was, as we have said, irrelevant to any issue in the case. Washington's out-of-court statements corroborating Wells's story were therefore not admissible under the state of mind exception to the hearsay rule.

In addition to state law grounds for excluding the evidence, defendant argues there was a second reason for excluding it. It violated his Sixth Amendment right to confrontation. Out-of-court statements that are testimonial in nature are inadmissible unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant. (*Crawford v. Washington, supra,* 541 U.S. 36.) Washington did not testify, and therefore his statements were "out of court," and he was "unavailable." Defendant had no prior opportunity to cross-examine Washington. The statements were also given to a police officer investigating Farber's murder; therefore, they were clearly testimonial. (*Crawford,* at p. 68 [testimonial statements include ones given during police interrogations].)

The People are correct, however, that defendant did not raise a timely Sixth Amendment objection.[15] The defendant objected on hearsay grounds only. (*People v. Chaney* (2007) 148 Cal.App.4th 772, 779 [a *Crawford* analysis is distinct from a generalized hearsay problem].) The issue is therefore forfeited.

Although a defendant generally may not argue on appeal that evidence should have been excluded for a reason not asserted at trial, a defendant may argue that the "asserted error in overruling the trial objection had the legal consequence of violating due process." (*People v. Partida* (2005) 37 Cal.4th 428, 431.) Therefore, the People concede that, to the extent, the admission of inadmissible hearsay had the legal consequence of violating defendant's due process rights, we may consider that constitutional claim.

---

**15** The defense raised the *Crawford* issue only after Detective Brown testified.

We conclude that, in any event, whether we analyze the error as constituting federal constitutional level error or merely state law error is not crucial to our prejudice analysis. Whether the admission of Detective Brown's testimony is reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836 [whether it is reasonably probable that a result more favorable to the appellant would have resulted in the absence of the error], or under *Chapman v. California* (1967) 386 U.S. 18, 24 [whether the error was harmless beyond a reasonable doubt], the result is the same.

The trial court gave a limiting instruction that Washington's statements were not admitted for their truth but "only for the limited purpose as a basis for opinions given by Detective Brown." Of course, this instruction is problematic because it instructed the jury to consider inadmissible statements for an irrelevant purpose: the basis for the detective's opinion about Wells's credibility. But the instruction had one slight virtue: it instructed the jury to disregard Washington's statements for any other purpose. The jury was therefore told not to assume that Washington's statements that defendant shot Farber were true.

But our harmless error analysis does not hinge on the strength of that limiting instruction alone. Randy Wells, who knew defendant well, saw him shoot Farber. True, he had credibility problems: he initially lied to the police, saying he saw nothing, and he only came forward when Detective Brown tracked him down, saying that he knew more about Wells than Wells realized. But video surveillance evidence corroborated Wells's statement that he was in the drive-thru the night Farber was there. Perry, who was in the restaurant at the time, saw a Black man and woman waiting in the drive-thru, just as Wells described.

Notwithstanding any credibility problem, Wells's story essentially matched Nogueda's, Farber's girlfriend. Nogueda testified that when the shooter came into the restaurant, he walked immediately to Farber's table and asked, " 'Where you from, cuz?' " Wells similarly testified that defendant walked to Farber's table and asked, " 'Where you from?' " Both Nogueda and Wells said that after the shooter made this gang challenge, Farber stood. Both Nogueda and Wells said that Farber responded to the

25

challenge, according to Nogueda with " 'What?' " and, according to Wells, with " 'Neighborhood Piru.' "

Wells's description of what the shooter wore also matched Nogueda's, Perry's and Davis's. Wells said defendant wore a black hoodie and black baseball hat. Nogueda said the shooter wore a black hoodie with a baseball hat under it. Perry said the shooter wore a black hooded sweater with the hood up and a beanie or bandanna underneath it. Davis said the man she saw running wore a "dark hooded hoodie."

Nogueda's and Wells's testimony was also consistent with Webb's. At a party just weeks after Farber was murdered, partygoers that included Webb and defendant were discussing Farber's murder. Webb heard defendant say that he and Farber exchanged words and then defendant shot him.

Also, Detective Brown told defendant that a friend who was in the restaurant's drive-thru that night saw him. Although the detective never identified that friend, Wells, by name, defendant, during a recorded jailhouse conversation, said, "Yeah, they waiting me out. They talking about Randy telling on me they like yeah you had the boy in the drive-thru, he know you . . . ." The only way defendant could have known that Wells was the "friend" in the drive-thru was if defendant saw him that night at Louisiana Fried Chicken.

Defendant, however, points out discrepancies between descriptions of the shooter's height and defendant's true height. Witnesses (Nogueda, Perry, and Davis) described the shooter as being several inches or more shorter than defendant, who is 5 feet 11 inches. The discrepancy in height, however, is of little moment, given the brevity of time and the conditions in which the witnesses saw the shooter (it was dark, the shooter wore a hat and hood, and Davis saw the shooter running).

Nogueda and Perry were unable to identify defendant from photographic six-packs, but Nogueda did identify him at the preliminary hearing and at trial as the shooter.

That the jury initially deadlocked also does not persuade us that the error was prejudicial. The trial testimony took place over seven days and involved numerous witnesses and exhibits. The jury had been deliberating for less than two days, a part of

26

which was spent listening to readback, when it declared itself deadlocked. The trial court told the jurors to continue deliberating, which they did.

We therefore conclude that the error in admitting the hearsay evidence was not prejudicial.

**IV.    Evidence of the victim's, Farber's, good character was admissible.**

Next, defendant contends that his rights to due process and to a fair trial were violated by the admission, over his objection, of Farber's good character. We hold that the trial court did not violate defendant's constitutional rights by admitting the evidence.

Character evidence is generally inadmissible to prove a person acted in conformity with it on a specific occasion. (Evid. Code, § 1101, subd. (a).) But under Evidence Code section 1103, evidence of a victim's character is admissible if offered to rebut evidence adduced by the defendant that the victim acted in conformity with his character. Thus, when a defendant introduces evidence that the victim had a bad character or a trait tending to show violence, the prosecution may offer evidence of the victim's good character in response. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1083; *People v. Fuiava, supra,* 53 Cal.4th at pp. 695-696.) A trial court's rulings on the admissibility of evidence are reviewed for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

No abuse of discretion occurred here. While cross-examining Nogueda (Farber's girlfriend and the first witness), defense counsel asked questions about her knowledge of any gang affiliation Farber had, for example, if she saw him or his friends wearing red or making hand signs. The defense also introduced multiple photographs showing Farber and/or his companions in poses or wearing clothes suggestive of a gang affiliation. Nogueda denied seeing Farber and his friends wear red or otherwise indicate they were gang members. A video tribute Nogueda made to Farber, however, after his death contained multiple photographs of Farber with men throwing gang signs, of Farber wearing red, and of Farber holding his hand as if he were shooting an imaginary gun. Although Nogueda posted the video tribute in which Farber made a possible gang sign with his hands, she denied he was throwing a Piru gang sign.

On redirect examination, the prosecutor elicited that Farber was a good student, but, over a defense objection, was not allowed to introduce additional evidence of his good character. Out of the jury's presence, the trial court noted that defense counsel, by eliciting the victim's bad character, may have opened the door to the prosecutor showing his good character. The prosecutor then asked to call Farber's school counselor to introduce evidence of Farber's good character. Defense counsel denied it was his intention to attack Farber's character, although " 'arguably you could say that was character.' "

The trial court found, over the defense's objection, that the defense had raised Farber's bad character, and therefore it was "fair game" to bring in his good character. The prosecutor then called Farber's high school counselor who testified about Farber's good grades, that Farber played football, he had plans to go to college and possibly become a firefighter, and the counselor never saw him engaged in gang-related activity.

These events establish that defendant, while cross-examining Nogueda, first introduced evidence of Farber's bad character, implying he was a gang member and violent. Evidence of Farber's good character was therefore admissible, in the trial court's discretion, under Evidence Code section 1103, subdivision (a).

## V.     Cumulative error.

Defendant contends that the cumulative effect of the purported errors undermined the trial's fundamental fairness and requires reversal. As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


CROSKEY, Acting P. J.


KITCHING, J.


29